CITY OF KANSAS TO USE OF T. J. ENRIGHT, Appellant, v. S. E. RATEKIN, Respondent.

Kansas City Court of Appeals, February 6, 1888.*

1. CHARTER OF KANSAS CITY—PROVISIONS AS TO SEWERS—REQUIREMENTS AS TO CONNECTIONS—CASE ADJUDGED.—The charter of Kansas City as to district sewers (art. 9, sec. 2, of charter) provides as follows : "District sewers shall be established within the limits of the district to be described by ordinance, connecting with a public sewer or other district sewer, or with the natural course of drainage, as such case may be." The court, at the request of the parties, made findings of facts in the case, of which one is as follows : " That the said sewer does not, and never did connect with any public sewer, or district sewer, or natural course of drainage, as contemplated by the charter of the City of Kansas." *Held*, that the tax bill, issued on a contract made under an ordinance for the construction of this sewer, is void. (PHILIPS, P. J., dissents).

2. DEDICATION—CHARACTER OF EVIDENCE TO SUSTAIN.—Where, without judicial proceedings or compensation, or solemn form of conveyances, it is sought to establish *in pais*, a divestiture of the citizen's landed property in favor of the public, the proof ought to be so cogent, persuasive, and full, as to leave no reasonable doubt of the owner's intent and consent.

APPEAL from Jackson Circuit Court, HON. JAMES H. SLOVER, Judge.

*Affirmed.*

The case is stated in the opinion.

C. A. KENYON, for the appellant.

I.   The large stone culvert crossing Bluff street at the foot of Lincoln street, was a public sewer within the meaning of article nine, section two, of the amended charter of Kansas City.   The City of Kansas has no power to construct a culvert, so-called, except by virtue

---

*NOTE :—Opinion in this case delivered to me by the clerk June 6, 1888.—*Reporter.*

of its power to construct public sewers.    Charter Kansas City, art. 9.    Webster says: "A sewer is a drain or passage to convey off water or filth underground,—a subterrranean canal."    Culvert: "An arched drain for passage of water under road or canal," etc.    See also Burrill Law Dict., title, Sewer.    "Sewer is a general term and includes culvert, just as street has been held to be, which includes sidewalk."    *Tober v. Grofmiller*, 7 West. Rep. 353.    In *Bennett v. New Bedford*, 110 Mass. 433, a subterranean aqueduct was held.to be a common sewer.    The court said:    "An appropriate use of which may be to relieve from natural as well as surface flow of water."    Earle, J., in *Queen v. Goldenanchter*, L. B. L. R. 1 Q. B. 328:    "The definition of sewer is not precise, but we think it ought to be construed according to its preamble and thus giving force to enactments."

II.    Article nine, section two, of the amended charter of Kansas City, does not require a direct and immediate connection with a public or district sewer.    The case at bar is on all fours with the case of *Eyerman v. Blakeley*, 78 Mo. 145.    A license may be created by a course of conduct, or implied from circumstances; and when created is justification for acts done under it, and cannot be revoked so long as it is essential to the enjoyment of an interest permitted to be created by the assent of the licensor.    *Baker v. Railroad*, 57 Mo. 273; *Stephenson v. Saline Co.*, 65 Mo. 425; *Melton v. Smith*, 65 Mo. 315; *Doe v. Oliver*, 2 Smith Lead. Cas. 761; 2 Am. Lead. Cas. 568, 569; *Heaney v. Heaney*, 2 Denio, 625; *Goodwin v. Cincinnati*, 18 Ohio St. 269; 2 Herman on Estoppel, secs. 982, 985.

III.    If a sewer is constructed over private property with the knowledge of the owner under an ordinance of the city and the owner makes no objection thereto and makes no effort to prevent the same, such owner is thereafter estopped from closing up such sewer.    Nor will the ordinance be void, and special assessments cannot be defeated on the ground that the sewer is over

private property. *Village v. Borden*, 94 Ill. 34, and cases cited ; *Cone v. Hartford*, 28 Conn. 376-7. Injunction will prevent him from closing it up. *Masonic Temple Ass'n v. Harris*, 9 Atl. Rep. 737.

IV.  An owner of land may without deed or writing dedicate it to public use ; no particular form or ceremony is necessary ; all that is required is the assent of the owner, and the fact of its being used for public purposes, and individual rights acquired by it. The law considers it an estoppel *in pais*, which precludes the owner from revoking the dedication. *Rector v. Hartt*, 8 Mo. 457, 458 ; *Griffin v. City*, 135 Mass. 365 ; *Brook v. Curtis*, 50 N. Y. 639 ; *Ferry v. Dodge Co.*, 6 Neb. 18 ; *Price v. Thompson*, 48 Mo. 361.

V.  "Dedication has been established in every conceivable way in which the intention of the parties could be manifested." *Waugh v. Luch*, 28 Ill. 488.

VI.  Under a charter like that of Kansas City, notice or objection to be valid must be on the mayor or council, and not on the clerk, engineer, or other officer. 2 Dillon on Mun. Corp. [3 Ed.] sec. 237 and note ; *Nichols v. Boston*, 98 Mass. 39 ; *Harrington v. School District*, 30 Vt. 155 ; *Hayden v. Middlesex*, 10 Mass. 397. Right of way for sewer may be condemned after sewer is built. Kansas City Charter, art. 9 ; *State v. Jersey City*, 29 N. J. Law, 452.

VII.  The instruction defining what was natural course of drainage within the meaning of article nine, section two, of amended charter, had evidence to support it, and should have been given. *Gillett v. Johnson*, 30 Conn. 180 ; *Earl v. Dettert*, 1 Beasley (N. J.) 280, 283.

WALLACE PRATT and FRANK F. BRUMBACK, for the respondent.

I.  A municipal corporation in creating a lien upon the property of one of its citizens is bound to proceed strictly according to the local laws that govern it. Its organic law fixes the limit of its action, and contracts

resulting from the exercise of its powers in a manner different from that laid down by its charter are *ultra vires* and absolutely void. *Kiley v. Oppenheimer*, 55 Mo. 374 ; *Leach v. Cargill*, 60 Mo. 316 ; *State v. Bank*, 45 Mo. 528 ; *City v. Whipple*, 71 Mo. 519 ; 1 Dillon Mun. Corp., sec. 89 ; 2 Dillon Mun. Corp., secs. 753, 769.

II. The sewer in question does not connect with any "public sewer or other district sewer, or with any natural course of drainage," as it is provided by the charter of the City of Kansas, all sewers to be paid for in special tax bills, shall connect, and, therefore, the the ordinance and tax bills, in this case, are void. Charter Kansas City, art. 9, sec. 2 ; Laws of Mo. 1875, p. 256 ; *City v. Swope*, 79 Mo. 446 ; *Lancaster v. Armstrong*, 56 Mo. 298.

III. The stone culvert built across and under Bluff street to protect the street from wash of surface water, with which the Bluff street sewer connects, is not a public sewer within the meaning of article nine, section two, of the charter of the City of Kansas, but is a "culvert" as distinguished from a "sewer" by that very charter and was built under a distinct authority to build a "culvert." Charter of Kansas City, art. 3, subdivs. 7, 8 ; Sess. Laws Mo., 1875, pp. 204, 205 ; art. 8, sec. 7 ; Sess. Laws Mo., 1875, p. 254.

IV The connection of a sewer required by the city charter means a direct connection ; or, at least, a connection through a culvert entirely under the control of the city, and subject to no question in regard to its permanence. At all events the appellant cannot be heard to complain in this court because he himself asked the trial court to declare that a connection with a public sewer meant a direct connection. He cannot try his case on one theory in the court below and on another in this court. *Walker v. Owen*, 79 Mo. 568 ; *Whetstone v. Shaw*, 70 Mo. 580 ; *Loomis v. Railroad*, 17 Mo. App. 340 ; *Duffy v. Railroad*, 19 Mo. App. 380 ; *Oberbeck v. Sportsman's Park Ass'n*, 17 Mo. App. 310.

V. Perhaps the Union Depot Company and Hannibal & St. Joseph Railroad Company were bound to take care of the surface water that came through the Bluff street culvert prior to the construction of the Bluff street sewer, but they certainly were not bound to take care of the sewage that was poured into their trench by the Bluff street sewer. Emptying the sewer upon private lands created a nuisance which could be abated. Charter of City of Kansas, art. 8, sec. 7; Session Laws Missouri, 1875, p. 254; Angell on Water Courses [6 Ed.] sec. 1086, p. 138; *Imler v. Springfield*, 55 Mo. 119; *Stewart v. City*, 79 Mo. 603; *Wilson v. Mayor*, 1 Denio (N.Y.) 595; *Field v. Railroad*, 21 Mo. App. 600; Dillon on Mun. Corp., secs. 1040, 1051; *Woodward v. Worcester*, 21 Mass. 1245; *Arn v. City*, 14 Fed. Rep. 236; *Beard v. Murphy*, 37 Vt. 104; *Cauffman v. Gruesmer*, 26 Pa. St. 407; Wood on Nuisances, secs. 118, 119, pp. 748, 876, 877; *Brayton v. Fall River*, 113 Mass. 227.

VI. The evidence shows that there was no estoppel against the Union Depot Company. In order to constitute a dedication of lands to public use by estoppel *in pais* it must appear that the conduct and acts of the owner are such as to leave no reasonable doubt as to the intention to make such dedication. Any declarations or acts by the owner inconsistent with an intention to dedicate, at once destroys the ground of dedication by estoppel. Silence alone will not make a dedication, and a protest against the use of the land by the public is conclusive evidence that there was no intention to dedicate. *McShane v. Moberly*, 79 Mo. 41; *Landis v. Hamilton*, 77 Mo. 554; *Acton v. Dooley*, 74 Mo. 63; Herman on Estoppel [2 Ed.] 1279, 1087; Bigelow on Estoppel, 438; Wood on Nuisances, secs. 524, 715; *Walker v. Railroad*, 57 Mo. 275; *Town v. Stevenson*, 69 Mo. 372; *Radenhurst v. Coates*, 6 Grant's Ch. (Ontario) 140.

VII. The appellant cannot in this court raise the point that the Union Depot Company's trench has been dedicated by estoppel, because he asked, in the court

below, an instruction directly opposed to the principle of law now invoked by him.     Cases cited above.

VIII.    Notice given to an officer of a municipal corporation within whose province the matters in respect of which the notice is given lie, is valid and a proper notice.    The engineer of the City of Kansas has charge of all public improvements, and is the proper person to whom protest should be made.    2 Dillon on Mun. Corp. (3 Ed.) sec. 237, and note; Charter of City of Kansas, art. 4, sec. 14.

ELLISON, J.—This was a suit upon a special tax bill issued by the City of Kansas for constructing a district sewer known as the Bluff street sewer, in sewer district number twenty-nine, under ordinance number 22,662.    The work was done and the tax bill issued in proper form.

The defendant answered, setting up among others the following defence :—Third. — That " said district sewer, so built and constructed, according to said ordinance number 22,662, does not and never did connect with any public sewer or district sewer, or with any natural course of drainage ", and that, therefore, the tax bill and ordinance were void.

It appears that the city had built a culvert across Bluff street, at the foot of Lincoln street, through which surface water passed on to adjoining flat lands of the Union Depot Company and the Hannibal & St. Joseph Railroad Company ; that afterwards these lands were raised by filling in, laying tracks, etc., and to protect them the companies built a trench across their grounds, connecting at one end with the culvert at Bluff street, and at the other with a district sewer built by the city about the same time the trench was constructed by the companies.    By this means the surface water passing through the culvert ran across the private property of the companies through their private trench.    Section two of the city ordinance establishing this sewer provides for the connection of one end of it as follows :    "Sec. 2. That a district sewer is hereby established and shall

be constructed within said sewer district number twenty-nine, as hereby established, which shall consist of a district main sewer of eighteen inches inside diameter, beginning at the culvert heretofore constructed across and under Bluff street at the foot of Lincoln street, connecting with the open trench, culvert, or sewer, crossing the grounds of the Hannibal and St. Joseph Railroad Company and the Union Depot Company of Kansas City to a connection with the lateral sewer of district sewer number one hundred and twenty-three."

The portion of the charter under which this ordinance was passed is as follows : " Sec. 2. District sewers shall be established within the limits of the districts to be described by ordinance, connecting with a public sewer or other district sewer, or with the natural course of drainage as each case may be."

The court at the request of the parties made findings of facts in the cause, of which one is as follows : " 19. That the said sewer does not and never did connect with any public sewer, or district sewer or any natural course of drainage, as contemplated by the amended charter of the City of Kansas." This finding was justified by the evidence, and under the authority of the *City of Kansas v. Swope*, 79 Mo. 446, we 'must hold the tax bill, upon which this suit was founded, to be void. The case was well stated by the trial judge in his written opinion in the case, in which he says : " It will thus be seen that the sewer in question depends for its outlet upon the open private sewer or trench owned and controlled by the Hannibal & St. Joseph Railroad Company and the Union Depot Company, and located upon the private grounds of these companies. And does not, as *required by the city charter*, connect with any public sewer, or district sewer, or with any natural course of drainage. The requirements of the charter cannot be disregarded in this way. The city has no preëxistent right or implied power in matters of this kind, and when it undertakes to act, it must do so within the limits prescribed by the legislature and if it failed so to do then

its acts are void." *Kiley v. Oppenheimer*, 55 Mo. 374; *Leach v. Cargill*, 60 Mo. 316; *City of Kansas v. Swope*, *supra*.

It is sought to avoid the effect of the finding made by the trial court, by the contention that the trench across the private ground of the Union Depot and Hannibal & St. Joseph Railroad Companies has become a sewer by dedication. But there is no evidence in the record to support such contention. I discover nothing from which a reasonable inference of a dedication could be drawn. "Where without judicial proceedings or compensation, or solemn form of conveyance, it is sought to establish, *in pais*, a divestiture of the citizen's landed property in favor of the public, the proof ought to be so cogent, persuasive, and full, as to leave no reasonable doubt of the existence of the owner's intent and consent." *McShane v. City*, 79 Mo. 41.

It is also insisted that these companies are forever estopped from asserting that their trench is not a public sewer and from preventing its use for sewerage purposes by the city. There is likewise no evidence upon which to base this assertion. The companies connected their trench with the culvert before this sewer was contemplated. Such connection was solely for the purpose of protecting their grounds from surface water and was not intended for the benefit of the public. Besides, allowing surface water to run through their trench is quite a different matter from permitting the foul sewage of a city to pass through it. There is no evidence to show that the companies knew of the intention of the city in regard to this connection until long after the sewer was begun and then the president of one of them protested against it.

The trial court properly found from the evidence that these companies "never agreed or consented to the use of such private sewer for sewerage purposes."

The judgment, with the concurrence of Judge Hall, is affirmed     Philips, P. J., dissents.

Philips, P. J., Dissenting.—The reasons assigned by the majority of my associates are not sufficient to satisfy my mind in destroying the amount of property involved in the tax certificates for constructing this sewer.

A proper understanding of the questions involved renders a more detailed statement of facts necessary. Prior to 1876 it appears that the grounds about where the Union Depot stands, in West Kansas City, were low, and formed something of a basin into which the waters from the southeast and east were accustomed to flow, from which they found their way out to the Missouri river on the north. At Bluff street, several hundred feet east of the depot building, where the waters coming down this and other streets, and natural depressions, ravines and the like, concentrated, the city built a short sewer or culvert, extending across Bluff street, of such capacity as to admit through it all the waters thus concentrating which, passing westward through this culvert, ran into said basin, or low grounds, and hence found their way out to the river. When the depot company located the Union Depot they filled up this low ground, so as to raise it about six feet ; so that the waters which came through this culvert, and from the southeast and east, would necessarily run upon and spread over the surface of the depot grounds, without any sufficient outflow to the river. It, therefore, became a necessity that some means should be devised by the company to protect its grounds from this overflow. The evidence shows that about this time one Buckley, who was in the employ of the Kansas City, Fort Scott and Gulf Railroad Company, which used this depot, and whose president was also president of the Union Depot Company, *happened* (?) to be elected from that ward a member of the common city council. At once he became active in securing the passage of an ordinance for building a district sewer, number one hundred and twenty-three, from the Missouri river south to Union avenue, its southern mouth stopping just at the west line of the depot

grounds. Whether so directed by the depot company or not, it seems that in urging the passage of this ordinance he gave it out that •if the city would build this sewer to the depot grounds, the depot company would continue it over its private grounds eastward connecting with the sewer passage through the culvert at Bluff street, thereby making a continuous sewer or drainage from the eastern mouth of the culvert to the river. District sewer one hundred and twenty-three was accordingly built by the city. Thereupon the depot company built the sewer over its grounds as indicated. This sewer of the company was eight feet wide, and eight feet deep, built up with solid masonry, and covered over with thick oak boards, so as to be removed in cleaning the sewer of *débris* carried into it. It was more capacious than sewer one hundred and twenty-three, and adequate for all the purposes of a connecting sewer east of it.

It further appears that it was the common understanding at the office of the city engineer that this private sewer was to be a continuation of sewer one hundred and twenty-three. It is observable that the depot company do not appear to have merely tapped district sewer number one hundred and twenty-three, as a private person securing sewerage, but they connected with the southern mouth of said sewer, wholly appropriating it, and built their sewer as if a continuation of it. After this the city passed the ordinance for building district sewer number twenty-nine, providing for its connection through the culvert at Bluff street with the sewer thus completed to it. This ordinance was published to the world; and was, as I contend, acted on, and put into force by the city without objection from the depot company. The only pretense of any objection by the depot company is to be found in the testimony of Mr. Nettleton, who was at the time its president. He testified that about the time the city was constructing this sewer, he asked Mr. Knight, who was city engineer, through the telephone, about it. "I said I objected to

all the water and filth going into that sewer. He said he did not intend to do that ; that he intended to give a contract to put in a closed sewer, that would not be offensive.''

This is all that ever occurred in the way of an objection from the depot company. This was no notice to the city. The engineer was not the person on whom to serve such notice. We all know how such work is conducted. The engineer's duties are simply to draw the plans and specifications as the basis of the ordinance. The work is done by a contractor. The engineer sees simply that it is done according to plans and specifications, approves or rejects the work w hen completed, and issues the tax certificates. In no other way does he represent the city. I undertake to say that no authority can be found to bind the city by such notice. The mayor is the representative officer, the recognized official head of the city. 1 Dill. Mun. Corp., sec. 208. Notice should be given to him, or at least to the council. Mere notice to a clerk, or the like, is not sufficient. *Nichols v. Boston*, 98 Mass. 39 ; 1 Dill. Mun. Corp., sec. 237, note 1, page 262.

It is furthermore to be observed, that the objection was not absolute. The engineer, to meet the objection of Nettleton, said he would, if necessary, let a contract to arch over the sewer. This seemed to satisfy Nettleton, for he made no further objection, and as a matter of fact permitted the work to go on. And the law is, that although the sewer may not have been afterwards arched over as suggested by the engineer, in consequence whereof the sewage through the sewer might possibly become offensive, this would not invalidate the tax certificates. As said in *Cone v. City*, 28 Conn. 364, 377 : '' It is claimed that the construction of this sewer was unlawful because it was so made as to discharge itself into the private stream of other persons without their authority. It does not appear that the proprietors of that stream are so injuriously affected by such discharge that they would have a right to prevent it. If,

however, it would be such a nuisance to them, we are by no means prepared to say that, while they suffer the sewer to be discharged into the stream without objection, the plaintiff can in this action complain of the assessment against him on that ground."

Then we have this state of facts, that sewer number one hundred and twenty-three was built so as to meet the necessities of the depot company. It was accordingly built up to their grounds; and by them actually continued, by connecting with its mouth, up to the culvert at Bluff street, thus utilizing this culvert belonging to the city. The city passed and published the ordinance for sewer twenty-nine which was to connect with the east mouth of the culvert, and hence through the private sewer to sewer one hundred and twenty-three, and thence to the river; thus making a complete system so far as it went. The company stood by, after the conversation with Knight, and saw this immense work go on to completion, without any notice to the city of any dissent. It has stood by up to 1885, when this suit was brought, permitting the city to use the private sewer as an outlet for sewer twenty-nine, without any protest. And in addition to this it would seem from the testimony of Knight that the city has been actually cleaning out the private sewer. In testifying as to why the private sewer was not arched over, he said: "This water coming down from the bluff rapidly would carry with it a large amount of *débris*, stones, and sticks, and a great deal of mud and everything else, and as soon as that struck the level it would be deposited, and in discussing the matter in fixing the drain, it was decided it should be made open for facilitating the cleaning of it. And frequently since the planks have been torn up and immense amounts of mud taken out. It was intended to use that as a safe place where the *débris* would be deposited, so that the water entering sewer one hundred and twenty-three would be comparatively free from sediment."

Now, I submit that from all these facts and circumstances there was ample evidence to warrant the court

in finding that the city had built this sewer with its outlet over the depot sewer under circumstances that would constitute a license from the company to the city to thus use the private sewer, and that the company is effectually estopped from asserting the contrary, or interfering with this connection.

An effectual estoppel *in pais* arises in this case, predicated upon a parol license from the depot company to the city to enter upon and use its private sewer. Where a party by his acts and conduct induces another to believe in the existence of a certain state of things, and he is thereby induced to act upon such belief, so as to alter his previous condition, he will be precluded from averring the contrary. *Chouteau v. Giddin*, 39 Mo. 251. Hence the familiar maxim, that he who is silent when he ought to speak will not be heard to speak when he should be silent.

As was said in *Baker v. Railroad*, 57 Mo. 265: "When plaintiff permitted the company to go on this land and construct their roadbed, it amounted to a license to them to do the work. * * * The entry under the license was lawful, and under such circumstances, after the expenditure of large sums of money by defendants, and making a costly structure, can the plaintiff, at his mere option and will, revoke the license? * * * A license is an authority, or power, and marked with the incidents that usually accompany powers. Among these may be mentioned the right of revocation at any time at the will or pleasure of the person creating the power, or granting the license; but the doctrine that a power may be recalled at the discretion of the donor, ceases to apply when the power is coupled with an interest, or is necessary to the possession or enjoyment of a right or title arising from the act or contract of the person who creates the power."

The rule is stated thus by Hare & Wallace: "A license will be a full justification for the acts done under it, even when they consist in the exercise of an authority or privilege on land, and would, if repeated under an

indefeasible right, be in effect an estate or easement ; the other, that a license cannot be revoked or withdrawn, so long as it is essential to the possession or enjoyment of a vested right or interest, which has been created by the licensor, or placed, with his assent, in a situation where the continuance of the license is essential to its enjoyment. These inferences obviously result from the general rule, that no one can recall a promise or declaration, made with a view to influence the course of another after he acted upon it, and thus place himself in a position where he must necessarily suffer if it be withdrawn. An equitable estoppel arises under the circumstances, to prevent the legal title from being used as a means of injustice." 2 Am. Lead. Cas. [5 Ed.] 568; 2 Smith's Lead. Cas. [6 Am. Ed.] 761.

So Herman, in his work on Estoppel (vol. 2, sec. 982), summarizes the rule as follows : " Where a licensee has expended money on the faith of the license, and put himself in a position that he would be seriously damaged by allowing it to be revoked, the estoppel is applied in the same manner as it is to those cases of acquiescence and silent consent. A parol license, when executed,. may become an easement on the land, and where acts have been done,in reliance upon a license, the licensor will be estopped from revoking it to the injury of the. licensee. This rule, that a license to do something on the licensor's land, followed by an expenditure on the faith of it, is irrevocable, rests upon the principle of estoppel, because the parties cannot be placed *in statu quo*. Equity treats a license thus executed as a contract giving an absolute right. A license cannot be revoked or withdrawn, as long as it is essential to the possession or enjoyment of the vested right or interest, which has been created by the licensor, placed, with his assent, where the continuance of the license is essential to its enjoyment. This is a branch of the rule that no one can withdraw a promise or declaration, made with a view of inducing others to act after they have acted upon it, and thus place themselves in a position where they must necessarily suffer if it be withdrawn."

The depot company is not complaining here. This sewer has now been in use as a part of the continuation of sewer twenty-nine for years. The courts would not permit the depot company to interrupt it, or close it up. *Masonic Temple Ass'n v. Harris*, 9 Atl. Rep. 737. The only remaining question, therefore, is, was this such a connection of sewer twenty-nine with the sewer leading out to the river as to meet the reasonable requirements of the charter? It does seem to me to be sticking in the bark of the letter of the statute to say, because the city did not build the sewer over the space between the Bluff street culvert and the mouth of sewer one hundred and twenty-three, it is not a continuous sewer connection in contemplation of the charter. "The letter killeth, but the spirit giveth life." Suppose the city, when about to provide for building sewer twenty-nine, had a deed or written permission from the depot to use perpetually the private sewer, would it be contended that it could not avail itself of the privilege because of the letter of the law? The license in this case creating an estoppel is as effectual as a deed or written compact. With like authority and reason could it be maintained, that if on the course of a sewer there should be found by the engineer, in a preliminary survey, a natural sewer-way, of the requisite dimensions, with bottom, sides and roof irresistibly rock-walled by nature's strong hand, extending a hundred feet on the line of the sewer, the city could not avail itself of the aid.

The fact that a part of this sewer lies over private property does not invalidate the assessment, the city having acquired an easement. In *Village v. Borden*, 94 Ill. 26, 34, it is expressly held that if a sewer be constructed over private property, with the knowledge of the owner, under an ordinance, without objection made known to the city, he will be effectually estopped from afterward making any claim for compensation, and the ordinance will not be void because the sewer is over private property, and the collection of special

taxes for its construction cannot be resisted on such ground. The Swope case has no application to the facts here presented. The property-owners have got all they can claim, a continuous sewer from the mouth of sewer number twenty-nine out to the Missouri river, the admitted natural drainage of the city. Why they should insist on the city incurring, at the property-holder's expense, the additional burden of condemning the right of way, and then building a sewer over these additional hundreds of feet, when they have the benefit of the private sewer, is incomprehensible, except on the theory that they would have public benefits for nothing.

The plaintiff, in my opinion, should have judgment.